IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 12, 2004 Session

# STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. TAMMY ROBBINS

**A Direct Appeal from the Juvenile Court for Weakley County**
**No. C1149  The Honorable James H. Bradberry, Judge**

---

**No. W2004-00487-COA-R3-PT - Filed November 18, 2004**

---

This is a termination of parental rights case. Tammy Robbins ("Ms. Robbins") appeals from the order of the Juvenile Court of Weakley County terminating her parental rights. Specifically, Robbins asserts that the trial court erred the following five respects: in admitting the testimony of a certain expert witness; in disregarding the testimony of another expert witness; in disregarding the testimony of Robbins's fact witnesses; in refusing to observe Robbins with her children; and in considering, in the termination proceeding, evidence of the State's earlier removals of the children from Robbins's custody. Because we find appellant's assertions to be without merit, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

William R. Neese of Dresden for Appellant, Tammy Robbins

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Michael G. Schwegler, Assistant Attorney General for Appellee, State of Tennessee, Department of Children's Services

# OPINION

## I.  FACTS

Ms. Robbins is the mother of two minor children at issue in this case, B.L.M. (D.O.B. 06/25/1995) and K.A.M. (D.O.B. 02/27/1996).[1] The record on appeal shows that both of Ms. Robbins' children have suffered the consequences of their mother's tumultuous life from their early infancy. The state has overseen multiple removals of the children, both voluntary and involuntary, from the custody of Ms. Robbins and her family. While it is not necessary to examine the facts of each of the removals in detail, a brief summary of each removal will help to illustrate the circumstances in which B.L.M. and K.A.M. have been raised.

From October 9, 1995 until October 11, 1995, Ms. Robbins voluntarily placed B.L.M. in foster care while she "pulled herself together" after an argument with Mr. McAlister, the children's father.

From December, 1995, to January 30, 1996, B.L.M. was involuntarily removed from Ms. Robbins' custody due to Ms. Robbins' failure to keep B.L.M. connected to an apnea monitor pursuant to the orders of his physician, and despite repeated pleas from Department of Human Services caseworkers. The caseworker's notes from this episode, admitted into evidence, also show that Ms. Robbins administered CPR to B.L.M. while he was breathing and gave Baby Tylenol to him while he was not running a fever.

From January 30, 1996 until sometime in May 1996, B.L.M. was involuntarily removed from Ms. Robbins' custody and placed in the care of Ms. Robbins' mother, Shirley Tatum, due to Ms. Robbins' pregnancy with her daughter K.A.M., and due to Ms. Robbins' inability to care for both K.A.M. and B.L.M. after K.A.M.'s birth.

Ms. Robbins voluntarily placed both children in state custody from May 24, 1996 until May 29, 1996. From August or September 1996 until December 1996, Ms. Robbins gave custody of K.A.M. to Angie and Jerry Gibson. Then, from January 24, 1997 until June 2, 1998, B.L.M. and K.A.M. were involuntarily removed from Ms. Robbins' custody, after DCS employees witnessed Tammy threatening B.L.M. and shaking K.A.M., who was still an infant at the time.

B.L.M. and K.A.M. then lived with Ms. Robbins or her immediate family until May 25, 2000, when her mother and sister-in-law contacted DCS and notified it that they could no longer care for the children. Pursuant to this request, the state removed the children from Ms. Robbins' custody until August 13, 2001—the fourth involuntary removal for B.L.M., and the second for K.A.M..

---

[1] The children's father is John McAlister. Mr. McAlister's parental rights were terminated in a separate proceeding, and he is not a party to this appeal.

In August 2001, the children's father, John McAlister, took custody of the children and a "no-contact" order was entered prohibiting Ms. Robbins from contacting or attempting to contact the children. The children remained with the father until April 31, 2003, when he informed the DCS he could no longer take care of the children due to his drug abuse, homelessness, and marital problems. The department regained custody of the children on May 1, 2003. On June 13, 2003, the State of Tennessee Department of Children's Services filed a petition to terminate the parental rights of Ms. Robbins, alleging that her parental rights should be terminated on the grounds of dependence, neglect, emotional, physical, and sexual abuse. On January 22, 2004, the court entered a judgment terminating Ms. Robbins' parental rights as to B.L.M. and K.A.M.. The order reads, in its entirety, as follows:

> This cause came to [be] heard on the 20th day of November, 2003, before the Honorable James H. Bradberry, Judge of the Juvenile Court of Weakley County, Tennessee, upon the sworn Petition To Terminate Parental Rights filed by the State of Tennessee, Department of Children's Services, with all parties properly before the Court on service of process. Present were representatives of the State of Tennessee, Department of Children's Services, and Assistant General Counsel, Stephanie J. Hale, Tammy Robbins, her attorney, William R. Neese, and the Guardian Ad Litem, Donald L. Ruis. Upon proof introduced at the hearing, statements of counsel, the recommendation of the Guardian Ad Litem, Donald L. Ruis, and the entire record, the Court finds upon clear and convincing evidence that the Petition To Terminate Parental Rights filed by the State of Tennessee, Department of Children's Services, is well taken as to Respondent, Tammy Robbins, and should be sustained and relief granted thereunder for the causes therein stated:
>
> > 1. That the children have been in the custody of the Department since May 1, 2003, and placed in a Department foster home.
> >
> > 2. The children have previously been in foster care as follows: [B.L.M.] was in custody from October 9, 1995 to October 11, 1995; December 20, 1995 until January 30, 1996; both children were in custody voluntarily from May 24, 1996 to May 29, 1996; both children were removed for their safety from January 24, 1997 until June 2, 1998 and May 25, 2000 until August 13, 2001. These were removals from the mother.

3. That by Order of the Weakley County Juvenile Court on August 13, 2001, the children were placed in the custody of their father and a no contact order was entered as to the mother who has had no contact upon recommendation of the mental health providers since October of 2000 as to [B.L.M.] and February of 2001 as to [K.A.M.]. The children were at that time placed with their father, John McAlister.

4. There was a continued plan for contact with the maternal side of the family as the children were to have family counseling with their maternal grandmother and then their mother if all went well.

5. That John McAlister contacted the Department and stated he was unable to care for the children due to drug usage, homelessness, and as he was suicidal and they have been in custody since May 1, 2003.

6. That upon the expert testimony of the psychological examiner, Dr. Charles Viar, Ms. Robbins, has a personality disorder and other mental health concerns and is presently unable to parent the children although finds her appropriate for visitation. He further testified that it was unlikely that Ms. Robbins is mentally competent to parent the children and would require long-term treatment. Beth Shanklin, MS, who had counseled Ms. Robbins in the past concurred with that it is highly unlikely that she is able to currently parent the children.

7. Therefore, the Court finds by clear and convincing evidence that Ms. Robbins is incompetent to adequately provide for the further care and supervision of the children because her mental condition is presently so impaired and is unlikely [sic] to remain so that it is unlikely that she will be able to resume care of or responsibility for the children in the near future and that, as set forth below, upon clear and convincing evidence that termination is in the best interest of the children.

8.  That upon the expert testimony of Beth Shanklin, MS, the children have been traumatized, these are special needs children, and visitation with their mother or maternal family members causes these children severe emotional harm. [B.L.M.] has ADHD, Post Traumatic Stress Disorder and related anxiety. [K.A.M.] has Robinow's Syndrome is [sic] requires medical attention and surgeries as well as is ADHD. There are issues of physical, emotional and sexual abuse.

9.  That the Court finds the witnesses for the Petitioner are credible.

10.  That the Court finds the mother, grandmother, and witnesses for the Respondent have a difference of perception in this matter.

11.  Pursuant to T.C.A. 36-1-113(I) the children have no meaningful relationship with their mother, there are past issues of abuse and neglect, that the children to this day are fearful of their mother and maternal relatives and suffer emotional and psychological harm, that these are special needs children, that the Department has exercised all reasonable efforts to assist this family, and due to the concerns of the mother's mental status, the Court finds by clear and convincing evidence that termination of parental rights is in the best interest of the children.

12.  The children have been removed by order of this Court for a period of six (6) months from their mother; the conditions which led to their removal still persist as their mother is unable to resume care; other conditions persist which in all probability would cause the children to be subjected to further abuse and neglect and in addition due to the special needs of the children and which, therefore, prevent the children's return to the care of the Respondent; there is little likelihood that these conditions will be remedied at an early date so that these children can be returned to Respondent in the near future; and the continuation of the legal parent and child relationship greatly

diminishes the children's chances of early integration into a stable and permanent home.

13. That it is by clear and convincing evidence that it is in the best interest of the children that the parental rights of their mother to the children be forever terminated and that the complete custody, control, and guardianship of the children be awarded to the State of Tennessee, Department of Children's Services, with the right to place the children for adoption and to consent to such adoption in loco parentis subject to any parental rights of the father.

14. That the Department of Children's Services has exercised reasonable efforts to prevent removal and reunify the family including CETAC counseling, several psychological evaluations, Home Ties, PEACH, counseling from several sources, supervised visitation, case management and numerous custodial placements.

15. That this Decree of guardianship shall have the effect of terminating all the rights and obligations of the Respondent(s) to the children and of the children to the Respondent(s) arising from the parental relationship, and the Respondent(s) are not hereafter entitled to notice of proceedings for the adoption of the children by another nor have any right to object to such adoption or otherwise to participate in such proceedings.

16. Awarding legal and physical custody to the mother would post a risk of substantial harm to the children.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED:

1. That this Decree of Guardianship shall have the effect of terminating all the rights and obligations of the Respondent, Tammy Robbins, to the children and of the children to the Respondent arising from the parental relationship, and the Respondent is not hereafter entitled to notice of proceedings for the

-6-

adoption of the children by another nor have any right to object to such adoption or otherwise to participate in such proceedings.

2. That all parental rights of Tammy Robbins, to the children ... are hereby forever terminated; that the complete custody, control, and guardianship of said children is hereby awarded to the State of Tennessee, Department of Children's Services, with the right to place the children for adoption and consent to such adoption in <u>loco parentis</u> subject to any parental rights of the father.

3. That the fee of the Guardian Ad Litem, Don Ruis, and appointed counsel, William R. Neese, shall be paid upon submission of the appropriate claim form.

4. That if any indigent Respondent proceeds on appeal to the Court of Appeals, the costs of the transcript of the trial of this matter shall be reimbursed by the Administrative Director of the Supreme Court, not to exceed two dollars and fifty cents ($2.50) per page. Any costs of the transcript exceeding two dollars and fifty cents ($2.50) per page, but not to exceed the maximum amount of the Delegated Purchase Authority, shall be paid by the Department of Children's Services.

On January 23, 2004, Ms. Robbins filed a motion to alter or amend the judgment. On February 6, 2004, the State of Tennessee filed an answer to Ms. Robbins' motion to alter or amend. On February 20, 2004, Ms. Robbins timely filed her notice of appeal. The motion to alter or amend was heard on March 23, 2004, and was denied by an order entered on April 20, 2004. Ms. Robbins filed a motion for additional time within which to file a record in this appeal. This motion was granted by an ordered entered on May 21, 2004.

## II. ISSUES

Appellant states the issues on appeal as follows:

**Issue 1:** "Whether the Trial Court erred in allowing a person not a qualified expert to offer expert opinions in testimony at trial and in considering that testimony in making its decision."

**Issue 2:** "Whether the Trial Court erred in basing its decision on inaccurate, incorrect and untrue testimony of a proffered expert witness while disregarding the testimony of a much more highly qualified expert witness without basis or reason."

**Issue 3:** "Whether the Trial Court erred in disregarding the testimony of Defendant and the fact witnesses she presented in deciding to terminate her parental rights."

**Issue 4:** "Whether the Trial Court erred in refusing to observe Defendant with her children, as requested by Defendant, in order to properly evaluate and determine the truth of Plaintiff's claim that Defendant's children feared her."

**Issue 5:** "Whether the Trial Court erred in terminating Defendant's parental rights based on the false claim that Plaintiff had removed Defendant's children from her and taken custody of them on many occasions when, in fact, Defendant had been forced to seek the assistance of Plaintiff by circumstances beyond her control and only did so in the best interest of her children."

## III. STANDARD OF REVIEW

Since this case was tried by a court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

## IV. ANALYSIS

**Issue 1: "Whether the Trial Court erred in allowing a person not a qualified expert to offer expert opinions in testimony at trial and in considering that testimony in making its decision."**

Ms. Robbins contends that the trial court erred in allowing Elizabeth Shanklin, a counselor with Pathways of Tennessee, to testify as an expert witness at trial. Ms. Robbins argues that since Ms. Shanklin was not a licensed counselor at the time of trial, she "cannot independently [form and express an expert opinion] as a matter of law."

On voir dire, Ms. Shanklin testified about her professional qualifications. She holds a bachelor's degree in psychology with a minor in biology from the University of Tennessee, and she holds a master's degree in clinical psychology from Murray State University. At the time of trial, she was three hours short of having a Licensed Professional Counselor certification. She had been employed by Pathways of Tennessee for approximately fourteen years, where the majority of her practice was providing treatment to children who have been physically, sexually, and emotionally abused. Because Ms. Shanklin was not a Licensed Professional Counselor, she worked under the supervision of licensed clinical social workers. In her work at Pathways, Ms. Shanklin counseled and diagnosed patients, subject to the review of a licensed clinical social worker.

At the time of trial, Ms. Shanklin had substantial experience rendering opinions as an expert in other court proceedings. She had already testified in eighteen other cases in 2003, prior to her testimony in the Robbins termination hearing.

In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. *McDaniel v. CSX Transportation*, **Inc., 955 S.W.2d 257, 263-264 (Tenn.1997).** To assist the trier of fact in this "gatekeeping" function, Tennessee Rule of Evidence 702 permits an expert to testify "in the form of an opinion or otherwise," only where the "scientific, technical, or other specialized knowledge" offered by the witness will substantially assist the trier of fact. Tenn. R. Evid. 702. Tennessee Rule of Evidence 703 requires an expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Tenn. R. Evid. 703. The determinative factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, **78 S.W.3d 817, 834 (Tenn.2002)**. A trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or is abused. *Id.* **at 832.**

We conclude that the trial court did not abuse its discretion in ruling that Ms. Shanklin was competent to render expert testimony in the case at bar. It is clear from the record that Ms. Shanklin had substantial professional experience both diagnosing and treating children who had been sexually, emotionally and physically abused. The fact that she was not a licensed counselor is immaterial to whether she was qualified to render an expert opinion in this matter. Ms. Robbins has directed us to no case law, nor have we found any, that provides authority for her view that an unlicensed counselor is, as a matter of law, incompetent to render expert testimony. The record of Ms. Shanklin's educational and professional accomplishments provided an ample basis on which the trial court could find that Ms. Shanklin was competent to render an expert opinion; indeed, in earlier proceedings, many other courts had found Ms. Shanklin to be a competent expert witness. Therefore, we conclude that this issue is without merit.

**Issue 2: "Whether the Trial Court erred in basing its decision on inaccurate, incorrect and untrue testimony of a proffered expert witness while disregarding the testimony of a much more highly qualified expert witness without basis or reason."**

We construe Ms. Robbins' second issue on appeal as a challenge to the respective weights that the trial court gave to the testimony of Elizabeth Shanklin (discussed *supra*, with reference to Issue 1), the counselor at Pathways of Tennessee who counseled B.L.M., K.A.M., and Ms. Robbins, and to the testimony of Dr. Charles Viar, a licensed senior psychological examiner with Pathways of Tennessee who evaluated Ms. Robbins before trial. It is Ms. Robbins' contention that Dr. Viar was "the only real expert, certainly the most qualified expert" to testify at Ms. Robbins' termination of parental rights hearing, and that since "Dr. Viar is so much more qualified than Ms. Shanklin ... there is no basis for accepting her opinion over Dr. Viar's and the Trial Court erred in doing so." In order to evaluate the merit of this issue, it is necessary to review both Dr. Viar's expert qualifications as well as the substance of his testimony at trial.

Both Ms. Robbins and DCS stipulated that Dr. Viar was qualified to render an expert opinion. Dr. Viar holds bachelor's and master's degrees in educational psychology from the University of Tennessee at Martin, and a doctorate in counseling from Memphis State University. He is a licensed senior psychological examiner. At the time of his testimony in this case, Dr. Viar had been employed with Pathways of Tennessee for ten or eleven years.

Dr. Viar had met with Ms. Robbins once, for approximately three hours, on October 27, 2003, before the November 2003 termination proceeding. In his testimony on direct examination at the termination proceeding, Dr. Viar described Ms. Robbins' demeanor as he observed it during their meeting:

> Q. When discussing her children, did you have any observations about her demeanor that raised some issues with you?
>
> A. She did not seem as upset about that as I expected her to be, I'll put it that way. Usually, when we have, especially a mother in a situation like this, they are generally beside themselves, and I did not pick up on that demeanor at all.

During his October 27 meeting with Ms. Robbins, Dr. Viar administered several tests to her, including the Minnesota Multi-Phasic Personality Inventory-2 (MMPI-2). Based on the results of the MMPI-2, Dr. Viar drew several conclusions about Ms. Robbins' personality and about her fitness to have custody of her children. He testified about these conclusions upon direct examination at the termination hearing.

> Q. Describe Ms. Robbins' personality to us based on the MMPI-2, what did you find there?
>
> A. On the MMPI-2 we had indications of impulse disorder, we had indications of a personality disorder. There were areas on the MMPI-2 that were significant. One thing was, one thing I would suspect would be a rise on the hysteria scale. On her validity scores there's a rise on the L-scale, and the L-scale is a validity scale measurement that was done for the MMPI-2, and what she was trying to do in that test was present herself in the best possible light and that, in effect, suppressed some of the other scales.
>
> Q. You actually made diagnosis of impulse control disorder, personality disorder, N.O.S., and then of course, the lower intellectual functioning. That all being said, how did you feel about her parenting skills, her ability to have custody of her children?
>
> A. My area or my impression of concern was that there was a lack of concern. I'm not saying she's a bad person. What I'm saying is that I really wonder if

she would pay the appropriate attention in providing for her kids on a day-in, day-out basis. That was basically my concern.

Q.    Let's go back to impulse control disorder. What would you expect from her—

A.    Someone to do things impulsively without thinking about them and sometimes regretting what they did afterwards. Impulse control disorder displays instability, if you will. It displays not planning ahead in time, using resources that shouldn't be used for particular things. If a child's needs were apparent and she made them impulsively and did not satisfy those needs and tended to her own needs at the time, those types of things.

Q.    Personality disorder again, that goes to somebody's personality, that's not something that can be changed—

A.    Personality disorder is not like a neurosis or psychosis or anything to that effect. Personality disorder is a pervasive type of behavior that occasionally injures other people, sometimes without intent and makes life very difficult for people around them.

Q.    Basically, within your expertise as a psychological examiner for the State of Tennessee, you found that she is not mentally competent to have custody of her children?

A.    I cannot in good conscience recommend that she have custody, although I did recommend that supervised visitation may be appropriate, depending on the reaction of the children. I think it's important for the children to know who their mother was.

Q.    I asked you about this earlier, but based on all this, you would want to know what .... the children thought about visitation?

A.    Yes, I think that's important how the children react to visitation. I think that's very important.

Dr. Viar went on to note that he had never met B.L.M. or K.A.M., nor had he reviewed their counseling records. Further on in his testimony on direct examination, Dr. Viar was questioned about the susceptibility of personality disorders to treatment:

Q.    When we talk about personality disorder, that's not something that can be fixed with counseling over the next three months or—

-11-

A. Personality disorders are very pervasive, they're very resistant to treatment. One of the main problems with personality disorder is that these people don't think anything is wrong with them. Inadvertently they can hurt other people, not intentionally sometimes, and I believe that's the type she has. I don't believe she is malicious in what she's doing, but I do think she has a pervasive personality disorder. I think maybe she would like to solve that situation, and obviously, it would take long term therapy to do that.

\* \* \*

Q. There has to be treatment through all this as well?

A. Right. If she goes into treatment, she is going to have to be willing to change and that's very tough for people because people don't like changing.

Later, under cross-examination, Dr. Viar stated that his recommendation of supervised visitation should be re-evaluated if Ms. Robbins' children were strongly resistant to visitation:

Q. [Y]our information that these children have a resistance to their mother would be hearsay, you have no personal knowledge of that?

\* \* \*

A. I have no personal knowledge. I haven't had any contact with the children or anything else.

\* \* \*

Q. So then you're not necessarily making?

A. I'm not aware of any resistance. I have absolutely no contact, nothing.

Q. So your recommendation is this supervised visitation unless there is some strong level of resistance and if there is, then we need to re-evaluate it at that point?

A. Absolutely.

Although Ms. Robbins claims that the trial court erroneously gave less weight to Dr. Viar's testimony than it did to Elizabeth Shanklin's testimony, it must be noted that Dr. Viar did not in any way endorse Ms. Robbins' fitness as a parent. His recommendation of supervised visitation was expressly not premised upon any interaction with B.L.M. and K.A.M., but rather was based upon his

assumption that B.L.M. and K.A.M.—with whom he had had no contact and whose records he had not reviewed—would not be resistant to such visitation.

In contrast with Dr. Viar's testimony that was based entirely upon his evaluation of Ms. Robbins, Ms. Shanklin's testimony was based largely upon her counseling sessions with B.L.M. and K.A.M. on a weekly or biweekly basis for almost three years. Ms. Shanklin related, in tragic detail, the disclosures made by B.L.M. and K.A.M. that led Ms. Shanklin to conclude that the children had been severely traumatized by their mother:

Q.      What was the presenting problem for [B.L.M.]?

A.      [B.L.M.] was living in a foster home; he had been placed there. There were allegations that he had been sexually abused. He was withdrawn, having problems sleeping, he was distrustful, destructive with toys, inattentive, hyper, argumentative, refused to comply, he blamed others and he would start fights.

Q.      In your course of assessing him, what determinations did you make? What did he tell you regarding his situation?

A.      He started talking about some of the incidents that had happened in his home with his biological mother and the treatment that he had received, the way that she had disciplined him.

Q.      What did he tell you about?

*       *       *

A.      He had made comments that Tammy has told him to report that John touched him inappropriately, John being his biological father. He's made comments that Tammy has whipped him and that she has taken a sword and stabbed the ceiling; that she has forced him to say things like "tell me that you love me," "give me a hug," "I'm not going to let you leave until you give me a hug." He reported that she had hit him on the ear and on the leg. He reported initially that Tammy held his penis when he was going to the bathroom. That was when he was six years old. He stated that she had played with his penis, that she had had [K.A.M.] lick [B.L.M.]'s penis. Tammy had had [B.L.M.] lick her private parts. He reported that Tammy had put a stick in his butt and blood came out. He also stated that his grandmother was pregnant when that occurred. He reported that Tammy had put handcuffs on him and described that she had "my arms around a tree" and she chopped the tree down with an ax. He reported that she would drink beer and whiskey out of a baby bottle, that she would in his words, "hump Gene" [Ms. Robbins' husband at the

-13-

time] and they would have to watch. He reported that she had humped a lot of other men and he had seen that. He reported that Tammy had put ants in his sister's underpants when they were outside in the yard playing. He reported that he had seen Tammy kiss Gene's—what he called winky, in regard to his penis. He reported that Tammy had cut his wrist and even more recently he showed me the scars that were on his wrist from what he said was that. He reported that she had slapped him in the mouth and hit him in the stomach, and at this time I would say that by my standards, that's physical, emotional, and sexual abuse.

Q.   These were all disclosures that he made at the age of five?

A.   Yes. These have been consistent through almost three years that I've worked with him.

Q.   You've dealt with children that have been coached—

A.   Yes.

Q.   —manipulated? Is this consistent with a child who has been manipulated or coached?

A.   No. [B.L.M.] as well as [K.A.M.] have consistently reported the same events occurring at different times in different settings. They have been individually in my office and reported the same incidents. I don't believe these children were coached. There was some real traumatic event that occurred to them. I don't know that I believe all the details, but I believe there was enough trauma in their lives that it has traumatized them.

Ms. Shanklin went on to testify that the children had made progress in her counseling sessions with them, stating, "[t]hey are doing very well because they feel safe in the environment they're in." Ms. Shanklin testified that past visitation with their mother had resulted in "deterioration" of the children's behavior. Ms. Shanklin was then questioned about whether she believed therapeutic visitation would be appropriate:

Q.   [W]hat is your opinion of therapeutic visitation at this point?

A.   At this point I feel it would be extremely destructive to the children's well being. It would erode all sense of trust that the children have in adults that they have contact with. It would be traumatizing and we would basically be back to where we were in 2000.

Questioned further about Dr. Viar's testimony, Ms. Shanklin stated, "I concurred with everything he said until the last few sentences." She was then asked to explain how she differed with his testimony:

Q.     What is your problem with that part [of Dr. Viar's testimony]?

A.     I believe that these children would be once again traumatized if they had any contact with their mother. They know that Tammy is their biological mother but at this point they do not seek to have a relationship with her, and with the post-traumatic stress disorder, I don't think they could emotionally or physically handle having any kind of contact with her.

Q.     Do you see that in the near future?

A.     I see that continuing for the rest of their life.

Concluding her testimony on direct examination, Ms. Shanklin was asked one more time whether she would recommend visitation with any members of the maternal side of the children's family:

A.     No, no visitation at all. The kids need a stable, secure, nonabusive home, and from the contact that I've had with the maternal family, they can't provide that kind of environment for the children.

Q.     And if forced to visit, what would be the harm to the children?

A.     They would be emotionally traumatized. They would be angry, aggressive, and they would be acting out in school, their grades would suffer. Their social interactions with everyone would also be destroyed. I don't think they could ever form a trusting relationship with anyone ever again.

The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility to be accorded will be given great weight by the appellate court. *See In re Estate of Walton v. Young*, **950 S.W.2d 956, 959 (Tenn. 1997)***; Whitaker v. Whitaker***, **957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)**. We conclude, from reviewing both Dr. Viar's and Ms. Shanklin's testimony, that the evidence does not preponderate against the factual findings made by the trial court. Indeed, it appears to this Court, from a thorough review of the trial transcript, that Ms. Shanklin's testimony supplied the trial court with evidence that was lacking from Dr. Viar's testimony given his lack of knowledge about the children—namely, evidence of the abuse suffered by B.L.M. and K.A.M. and the likely effects of such abuse should they continue to have contact with Ms. Robbins or Ms. Robbins' family. This issue is without merit.

     **Issue 3: "Whether the Trial Court erred in disregarding the testimony of Defendant and the fact witnesses she presented in deciding to terminate her parental rights."**

Appellant contends that the trial court erroneously disregarded the testimony of Defendant and her fact witnesses in rendering its judgment in this matter. In its Order Terminating Parental Rights and Partial Decree of Guardianship, the trial court stated, in relevant part, as follows:

Upon proof introduced at the hearing, statements of counsel, the recommendation of the Guardian Ad Litem, Donald L. Ruis, and the entire record, the Court finds upon clear and convincing evidence that the Petition to Terminate Parental Rights filed by the State of Tennessee, Department of Children's Services, is well taken as to Respondent, Tammy Robbins, and should be sustained and relief granted thereunder for the causes therein stated:

\*       \*       \*

9.      That the Court finds the witnesses for the Petitioner are credible.

10.     That the Court finds the mother, grandmother, and witnesses for the Respondent have a difference of perception in this matter.

11.     Pursuant to T.C.A. 36-1-113(i) the children have no meaningful relationship with their mother, there are past issues of abuse and neglect, that the children to this day are fearful of their mother and maternal relatives and suffer emotional and psychological harm, that these are special needs children, that the Department has exercised all reasonable efforts to assist this family, and due to the concerns of the mother's mental status, the Court finds by clear and convincing evidence that termination of parental rights is in the best interest of the children.

We first note that, contrary to Ms. Robbins' contention, the trial court's order indicates that it did not "disregard" the testimony of Ms. Robbins or her fact witnesses. The trial court's finding of fact, to the effect that Ms. Robbins and her witnesses had "a difference of perception in this matter," leads us to conclude that the trial court properly evaluated the truthfulness and credibility of these witnesses. When the resolution of issues in a case depends upon the truthfulness of witnesses, the trial judge, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, **910 S.W.2d 412 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn.Ct.App. 1997).** The weight, faith and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id.*; *In re Estate of Walton v. Young*, **950 S.W.2d 956, 959 (Tenn. 1997)**.

Having reviewed the record on appeal, we note that, at trial, the State presented a great deal of testimonial evidence from different witnesses—including counselors, caseworkers, community members, and foster parents—that consistently supported the State's assertion that B.L.M. and K.A.M. were neglected and abused while in the care of Ms. Robbins and her family. Indeed, a

striking consistency in the testimony offered by the State's witnesses concerned the children's intense fear of their mother and maternal family members. Ms. Robbins and her family denied that there were any problems with Ms. Robbins' parenting skills. Under these circumstances, it was incumbent upon the trial court to evaluate the truthfulness and credibility of the witnesses. Our review of the record on appeal shows that the trial court could have reasonably doubted the credibility of Ms. Robbins' fact witnesses. Therefore, we hold that the evidence does not preponderate against the trial court's evaluation of the truthfulness and credibility of the witnesses in this case.

**Issue 4: "Whether the Trial Court erred in refusing to observe Defendant with her children, as requested by Defendant, in order to properly evaluate and determine the truth of Plaintiff's claim that Defendant's children feared her."**

Ms. Robbins' next issue on appeal concerns the refusal of the trial court to observe Ms. Robbins with her children in order to evaluate the truth of the State's claim that Ms. Robbins' children feared her. Assuming, for the sake of argument, that such an observation would constitute relevant evidence, we conclude that, in light of the broad range of evidence admitted at trial that tended to show the nature of B.L.M. and K.A.M.'s feelings for Ms. Robbins, the trial court properly refused to conduct such an observation. Much testimonial and documentary evidence was admitted at trial that was relevant to the question of the children's feelings toward Ms. Robbins. Given the emotional nature of the issues involved, and the ages of B.L.M. and K.A.M., it is likely that any such observation would have to be conducted under carefully controlled conditions in order to have any significant probative value. Such measures would be time-consuming in the setting of a trial. Under these circumstances, the trial court could reasonably have concluded that an observation by the trial court would cause undue delay and waste of time, and that it would constitute unnecessary cumulative evidence. Tenn. R. Evid. 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Therefore, we conclude that this issue is without merit.

**Issue 5: "Whether the Trial Court erred in terminating Defendant's parental rights based on the false claim that Plaintiff had removed Defendant's children from her and taken custody of them on many occasions when, in fact, Defendant had been forced to seek the assistance of Plaintiff by circumstances beyond her control and only did so in the best interest of her children."**

Ms. Robbins' fifth issue on appeal is her contention that the trial court erred in basing its decision to terminate her parental rights on the "false claim" that the State of Tennessee, Department of Children's services had removed Defendant's children from her on "many occasions." Ms. Robbins asserts that, in fact, Defendant was forced to seek the State's assistance by circumstances beyond her control.

The trial court found, in its Order Terminating Parental Rights (reproduced in its entirety *supra*), that the State removed one or both of the children involuntarily on four occasions, and voluntarily on one occasion. Ms. Robbins contests the trial court's finding that the four involuntary removals were in fact involuntary, and further contends that the trial court erroneously based its decision to terminate her parental rights based on these multiple removals. We will address each of these two points in turn.

The record on appeal overwhelmingly supports the trial court's finding that there were four involuntary removals of one or both of Ms. Robbins' children. The voluminous documentation of these removals, admitted into evidence during the termination hearing, was essentially uncontradicted by Ms. Robbins. We conclude that the evidence does not preponderate against the trial court's findings concerning the circumstances of these removals.

We further conclude there is no merit in Ms. Robbins' contention that the trial court erroneously based its decision to terminate the parental rights of Ms. Robbins on these removals. First, we note that a review of the Order itself contains no indication that the termination was based solely upon the fact of these removals. Rather, the court based its judgment on a totality of evidence, including evidence of Ms. Robbins' incompetency as a parent due to her mental condition; evidence of the trauma suffered by the B.L.M. and K.A.M. while in the care of their mother and her family; the lack of a meaningful relationship between the children and their mother; the children's fear of their mother and their mother's family; and the persistence of conditions that led to their removal; and the fact that any remedy of these conditions was unlikely. All of these factors were cited by the trial court in concluding that the termination was in the best interest of the children.

We conclude that the trial court based its decision to terminate Ms. Robbins' parental rights upon a range of testimonial and documentary evidence, not solely upon the fact of the removals of the B.L.M. and K.A.M. from her custody on several occasions. We further conclude, upon a thorough review of the record, that the evidence does not preponderate against the trial court's factual findings that served as a basis for the termination of Ms. Robbins' parental rights. Therefore, this issue is without merit.

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court. Costs of this appeal are assessed to the Appellant, Tammy Robbins, and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.